UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | |
|---|---|
| DODI L. RUBENSTEIN<br>20 Birchwood Avenue<br>Oak Park, CA 91377<br>(Ventura County, CA)<br><br>    Plaintiff,<br><br> v.<br><br>MARTEK BIOSCIENCES CORPORATION<br>6480 Dobbin Road<br>Columbia, MD 21045<br>(Howard County)<br><br>STEVE DUBIN<br>6480 Dobbin Road<br>Columbia, MD 21045<br>(Howard County)<br><br>ROBERT FLANAGAN<br>6480 Dobbin Road<br>Columbia, MD 21045<br>(Howard County)<br><br>DOUGLAS MACMASTER<br>6480 Dobbin Road<br>Columbia, MD 21045<br>(Howard County)<br><br>EUGENE ROTBERG<br>6480 Dobbin Road<br>Columbia, MD 21045<br>(Howard County)<br><br>JEROME KELLER<br>6480 Dobbin Road<br>Columbia, MD 21045<br>(Howard County) | No. _____<br><br><br>JURY TRIAL DEMANDED |

JAMES BEERY
6480 Dobbin Road
Columbia, MD 21045
(Howard County)

POLLY KAWALEK
6480 Dobbin Road
Columbia, MD 21045
(Howard County)

HARRY D'ANDREA
6480 Dobbin Road
Columbia, MD 21045
(Howard County)

ROBERT MAYER
6480 Dobbin Road
Columbia, MD 21045
(Howard County)

MICHAEL DEVINE
6480 Dobbin Road
Columbia, MD 21045
(Howard County)

and

DAVID PERNOCK
6480 Dobbin Road
Columbia, MD 21045
(Howard County)

Defendants.

**COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATIONS OF SECTIONS 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff respectfully brings this action for breach of fiduciary duty and violations of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), and US Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder against the herein named defendants and alleges the following upon information and belief, except as to those allegations specifically pertaining

to plaintiff, which are predicated upon the investigation undertaken by plaintiff's counsel:

**NATURE OF THE ACTION**

1.      This is a shareholder action brought by plaintiff, a public shareholder of Martek Biosciences Corporation ("Martek" or "Company") against the Company and its Board of Directors ("Individual Defendants" or the "Board"), in connection with the proposed buyout of Martek by Koninklijke DSM N.V. ("DSM"), and its wholly-owned subsidiary Greenback Acquisition Corporation ("Merger Sub"), which was formed solely to facilitate the transaction ("Proposed Transaction"). This matter arises out of defendants' dissemination of a false and misleading Solicitation/Recommendation Statement ("Recommendation Statement") in violation of Sections 14(e) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, and the Board's breaches of their fiduciary duties owed to Martek's stockholders under state law.

2.      On December 21, 2010, DSM and Martek announced a definitive agreement under which DSM will commence a tender offer to acquire all of the outstanding shares of the Company for $31.50 per share in cash for a total value of approximately $1.09 billion. The tender offer was commenced on January 13, 2011 and is scheduled to expire on February 18, 2011.

3.      The Board has breached their fiduciary duties by agreeing to the Proposed Transaction for grossly inadequate consideration. As described in more detail below, given Martek's recent strong performance, its strong product pipeline, its positioning for growth, and the synergies DSM will realize from the merger, the merger consideration is inadequate and significantly undervalues the Company. In addition, the Sum-of-the-Parts Discounted Cash Flow Analyses conducted by Allen & Co. ("Allen"), the Company's financial advisor, yielded a value for the Company as high as $44.50 per share.

4.      In addition, as described in more detail below, the Individual Defendants conducted a flawed process in selling Martek, failing to adequately seek out potential buyers for the Company. The Company failed to conduct any formal pre-market check to seek out potential acquirers. Rather, after three private equity firms, as well as DSM, indicated an interest in exploring some sort of transaction or investment with Martek, the Company engaged in discussions solely with those parties, and determined not to contact any additional parties. Moreover, after both DSM and "Party B" submitted offers to acquire Martek for $31.50 per share, the Board unreasonably determined to enter into a transaction with DSM despite the fact that Party B's proposal had more favorable terms for Martek than DSM's proposal, including permitting Martek to conduct a go-shop process following execution of the Merger Agreement.

5.      Rather, the Individual Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for Martek. Specifically, pursuant to the merger agreement dated December 20, 2010 ("Merger Agreement"), defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirors, or even in continuing discussions and negotiations with potential acquirors; (ii) a provision that provides DSM with three business days to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay DSM a termination fee of $38 million in order to enter into a transaction with a superior bidder. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives including a sale of all or part of martek.

6.     In an attempt to secure shareholder approval of this unfair deal, on January 13, 2011, Martek issued a materially misleading Schedule 14D-9 Recommendation Statement with the United States Securities and Exchange Commission ("SEC"). The Recommendation Statement recommends that Martek's shareholders accept the offer, tender their shares, and adopt the Merger Agreement. However, the Recommendation Statement is misleading because it fails to provide the Company's shareholders with material information and provides them with materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction. Specifically, the Recommendation Statement omits and/or misrepresents the material information set forth below in contravention of Sections 14(e) and 20(a) of the 1934 Act and/or defendants' fiduciary duty of disclosure under state law.

7.     As explained herein, this information is material to the impending decision of Martek's shareholders whether to tender their shares and vote in favor of the Proposed Transaction. As such, defendants' violations of Sections 14(e) and 20(a) of the 1934 Act and their breaches of fiduciary duty under state law to maximize shareholder value and disclose all material information in connection with a merger transaction threaten shareholders with irreparable harm for which money damages are not an adequate alternate remedy. Thus, plaintiff seeks injunctive relief to ensure that defendants cure their breaches of fiduciary duty and violations of Sections 14(e) and 20(a) before Martek shareholders are asked to tender their shares and vote on the Proposed Transaction, and that defendants are not permitted to seek shareholder support of the Proposed Transaction without complying with their duty under state law to maximize shareholder value and the federal securities laws and state law to provide shareholders with all material information about the sales process, the merger consideration, and the company's intrinsic value.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act for violations of Sections 14(e) and 20(a) of the 1934 Act and SEC Rule 14a-9.

9.     Venue is proper in this District because Martek has its principal place of business in this District. Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all of the witnesses are located and available to testify at the jury trial permitted on these claims in this Court. Moreover, each of the Individual Defendants, as Martek officers and/or directors, has extensive contacts in this District.

## PARTIES

10.     Plaintiff is and was, at all times relevant hereto, a holder of Martek common stock.

11.     Defendant Martek is a corporation organized and existing under the laws of the State of Delaware. It maintains its principal corporate offices at 6480 Dobbin Road, Columbia, Maryland 21045.

12.     Defendant Steve Dubin has been the Chief Executive Officer and a director of the Company since 2006. Dubin became Chief Executive Officer of Martek in June 2006 after serving since September 2003 as President of Martek. Dubin joined Martek in 1992 and has served in various management positions, including Chief Financial Officer, Treasurer, Secretary, General Counsel and Senior Vice President of Business Development. In 2000, he moved to a part-time position of Senior Advisor--Business Development, a role he filled until his election to President of Martek in September 2003.

13.     Defendant Robert Flanagan has been Chairman of the Board of the Company since 2007, and a director of the Company since 2002.

14.     Defendant Douglas MacMaster has been a director of the Company since 1993.

15.     Defendant Eugene Rotberg has been a director of the Company since 1992.

16.     Defendant Jerome Keller has been a director of the Company since 2005.

17.     Defendant James Beery has been a director of the Company since 2004.

18.     Defendant Polly Kawalek has been a director of the Company since 2006.

19.     Defendant Harry D'Andrea has been a director of the Company since 2006.

20.     Defendant Robert Mayer has been a director of the Company since 2008.

21.     Defendant Michael Devine has been a director of the Company since 2008.

22.     Defendant David Pernock has been a director of the Company since 2009.

23.     Defendants Dubin, Flanagan, MacMaster, Rotberg, Keller, Beery, Kawalek, D'Andrea, Mayer, Devine, and Pernock are referred to herein collectively as the "Individual Defendants."

24.     Collectively, Martek and the Individual Defendants are referred to herein as the "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     Under applicable law, by reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and owe Plaintiff the duties of good faith, fair dealing, loyalty and full and candid disclosure.

26.     By virtue of their positions as directors and/or officers of Martek, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Martek to engage in the practices complained of herein.

27.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of

an ordinarily prudent person.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value shareholders will receive rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision.  To diligently comply with this duty, the directors of a corporation may not take any action that:

        a.      adversely affects the value provided to the corporation's shareholders;

        b.      contractually prohibits them from complying with or carrying out their fiduciary duties;

        c.      discourages or inhibits alternative offers to purchase control of the corporation or its assets;

        d.      will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

        e.      will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

28.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff, including their duties of loyalty, good faith and independence, insofar as they, among other things, engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff.

29.    Furthermore, the Individual Defendants, as directors of Martek, must adequately ensure that no conflict of interest exists between the Individual Defendants' own interests and their fiduciary obligations to maximize shareholder value or, if such conflicts exist, to ensure that all such conflicts will be resolved in the best interests of the Company's stockholders.

## FACTUAL ALLEGATIONS

**A.     Background**

30.     Martek is a leader in the innovation, development, production, and sale of high-value products from microbial sources that promote health and wellness through nutrition. The Company's technology platform consists of its core expertise, broad experience, and proprietary technology in areas such as microbial biology, algal genomics, fermentation, and downstream processing. This technology platform has resulted in Martek's development of a number of products, including the Company's flagship product "life'sDHA," a sustainable and vegetarian source of algal DHA (docosahexaenoic acid), important for brain, heart, and eye health throughout life for use in infant formula, pregnancy, and nursing products, foods and beverages, dietary supplements, and animal feeds. The Company also produces "life'sARA" (arachidonic acid), an omega-6 fatty acid, for use in infant formula and growing-up milks.

31.     Martek's subsidiary, Amerifit Brands, develops, markets, and distributes branded consumer health and wellness products and holds leading brand positions in all of its key product categories. Amerifit products are sold in most major mass, club, drug, grocery, and specialty stores and include: Culturelle, a leading probiotic supplement; AZO, the leading OTC brand addressing symptom relief and detection of urinary tract infections; and Estroven, the leading all-natural nutritional supplement brand addressing the symptoms of menopause.

32.     In addition, Martek has a strong product pipeline which is expected to lead to increased revenues and growth, as new products are released in 2011 and beyond. As displayed in a November 2010 investor presentation, Martek has the following near term and long term products in their pipeline, some of which are expected to be commercialized as early as 2011:

# Project Pipeline Overview



| | Project | Description | Channel | Expected Commercialization |
|---|---|---|---|---|
| **Near Term** | MIDAS Study | Improved cognitive function in healthy adults | Amerifit BRANDS | 2011 |
| | Microbial EPA/DHA | Algal EPA+DHA oil similar to higher quality fish oils | Amerifit BRANDS | 2011 |
| | DHA Combination Products/ Amerifit line extensions | Nutritional supplements with DHA + other ingredients | Amerifit BRANDS | 2011 |
| | Next Generation IF DHA | Lower cost algal DHA oil for infant formula | MARTEK life enriched | 2013 |

| | Project | Description | Partner |
|---|---|---|---|
| **Longer Term** | Therapeutic Proteins | Algal-based protein expression platform | *Confidential* |
| | Microbial Biofuels | Conversion of sugar into biodiesel through fermentation | bp |
| | Seed Oil DHA | Oilseed-based production system for DHA | Dow AgroSciences |
| | High Purity DHA | 90+% pure DHA product for therapeutic applications | *TBD* |
| | Chondroitin | Chondroitin production via bacterial fermentation | SEIKAGAKU |
| | Shrimp Antiviral | Algae-based feed with therapeutic benefits | MUSC |

13

33.     Martek has been performing very well recently. On September 1, 2010, Martek announced its financial results for the third quarter of fiscal 2010, ending July 31, 2010. Among the financial highlights, the Company reported that: (a) revenues for the third quarter were $117.2 million, up 51% from $77.8 million in the third quarter of fiscal 2009; and (b) GAAP net income was $11.9 million, or $0.35 per diluted share, for the third quarter, an increase of 33% compared to $8.9 million, or $0.27 per diluted share, for the third quarter of fiscal 2009. In addition, the Company generated strong

operating cash flow of $36.7 million for the quarter. Accordingly, Martek's strong cash generation since the acquisition of Amerifit in February 2010 allowed the Company to pay off the acquisition financing sooner than anticipated. As a result, as of July 31, 2010, the Company returned to being essentially debt-free and now has its entire $100 million credit line available.

34.     In the press release announcing the financial results for the third quarter of fiscal 2010, defendant CEO Dubin commented on the Company's strong quarter and promising outlook, stating:

> Martek's strong third quarter results reflect another good quarter for DHA and ARA sales to our infant formula customers, another record quarter of DHA sales in non-infant formula markets, strong sales of Amerifit's consumer branded products and improved gross margins. I believe that Martek's strong run rate coming out of fiscal 2010 will provide an excellent platform from which to grow as we continue to expand our DHA ingredients business beyond infant formula, begin to commercialize new products currently in development as consumer branded products sold through Amerifit's marketing and distribution channels and continue our efforts to reduce production costs. Accordingly, I expect growth in revenues, margin and earnings in 2011. It is also worth noting that, as a result of our strong earnings and robust cash flow generation, our Amerifit acquisition debt has been repaid earlier than expected and Martek is once again essentially debt-free. Martek's solid balance sheet and strong financial performance provides us with great flexibility which, among other things, should allow us to launch new Martek products, as noted above, during our next fiscal year, continue to prudently invest in our promising R&D pipeline and explore new complementary business opportunities.

35.     On December 8, 2010, Martek announced its financial results for the fourth fiscal quarter ending October 31, 2010. The Company had another strong quarter: (a) total revenues for the fourth quarter were $119.1 million, up 36% from the fourth quarter of fiscal 2009; and (b) non-GAAP earnings per share were $0.41, a 24% increase from $0.33 per diluted share in the prior year's fourth quarter. Commenting on the Company's strong quarter, successful year, and exciting opportunities for future growth, defendant Dubin stated:

> Martek's fourth quarter came in at the high end of our expectations and concluded a year of many accomplishments for Martek. Revenue grew across all business segments in 2010, our core infant formula ingredients business was strengthened through the

extension of the terms of two of our key infant formula sole source supply agreements, and significant improvements on the operational side of the business were implemented which helped drive growth in both margins and income. In addition, we expanded our business platform through the acquisition of Amerifit, and made significant progress on our product and technology pipeline, both of which provide Martek with exciting opportunities for future growth.

**B.     The Proposed Transaction**

36.     Despite its recent strong performance, its strong product pipeline, and positioning for growth, the Company agreed to enter into the Proposed Transaction. In a press release dated December 21, 2010, 2010, the Company announced that it had entered into a merger agreement with DSM, pursuant to which DSM will acquire all of the outstanding shares of the Company through a cash tender offer for $31.50 per share. DSM is expected to commence the tender offer between January 10 and January 25, 2010. Specifically:

> Royal DSM N.V., the global Life Sciences and Materials Sciences company, and Martek Biosciences Corporation today announce that they have entered into a definitive agreement under which DSM will acquire all the outstanding shares of common stock of Martek for US$31.50 in cash per share for total consideration of US$1,087 million. The transaction has been approved by DSM's Supervisory Board and is recommended by Martek's Board of Directors. Subject to customary conditions, the tender process is expected to close in February 2011, and the transaction is expected to close in the first or second quarter of 2011.

> The agreed price represents a premium of 35% to Martek's closing share price of US$23.36 on December 20, 2010, and 39% to the volume weighted average closing price of Martek's common stock over the last 90 days.

> The Transaction

> The acquisition is structured as an all-cash tender offer for all the outstanding shares of Martek common stock to be followed by a merger in which each remaining share of Martek common stock would be converted into the same cash per share price paid in the tender offer. The tender offer is expected to commence between 10 January 2011 and 25 January 2011. The Martek Board of Directors has recommended that Martek stockholders accept the offer and tender their shares into the offer when it is made. The acquisition is subject to the satisfaction of customary conditions, including the tender of a majority of the outstanding shares of Martek common stock on a fully-diluted basis and the

expiration or earlier termination of the Hart-Scott-Rodino antitrust waiting period and other regulatory approvals. The tender process is expected to close in February 2011, and the transaction is expected to close in the first or second quarter of 2011.

The transaction is not subject to a financing condition, and DSM intends to finance the acquisition from existing cash.

\* \* \*

Martek is headquartered in Columbia Maryland USA and had annual net sales of US$ 450 million for its fiscal year which ended October 31, 2010. Martek has five principal locations and some 600 employees.

Feike Sijbesma, CEO/ Chairman of the DSM Managing Board, said:

"Martek is a great company and a leader in the innovation, development, production and sale of high-value products from microbial sources that promote health and wellness through nutrition. DSM has enormous respect for Martek's products, organization and people. We look forward to working with their highly skilled team.

"This acquisition is an attractive and logical next step for DSM. Martek's leading position in healthy, natural ingredients and algal technology will add a new growth platform to our Nutrition business. DSM is a unique partner for Martek and, with our strong track record of growing businesses in competitive environments, we believe we can help to lift Martek to the next level."

Martek's Chairman, Robert J. Flanagan, said:

"We are proud of the achievements of our company and are pleased to see the company's value recognized by DSM. Following thorough analysis by our board of directors, we have determined that this transaction offers the best value for our stockholders."

Martek's CEO, Steve Dubin, said:

"We are pleased to announce this transaction, and we believe that it is in the best interest of Martek and our stockholders. After careful analysis, our board of directors unanimously approved this transaction with DSM, which has a strong reputation and global operations. We are pleased that this transaction appropriately recognizes the value of Martek's nutritional ingredients, technology platform, market position and skilled workforce, while providing significant value to our stockholders. We have worked collaboratively with DSM for many years, and we are confident that they share our vision for Martek's future."

**C.   The Unfair Price**

37.   Given the Company's recent performance and future prospects, the consideration shareholders are to receive is inadequate. Martek shareholders are being cashed out at the unfairly low price of $31.50 per share, which does not adequately take into account Martek's strong product pipeline and the tremendous growth potential for Martek. In addition, the Sum-of-the-Parts Discounted Cash Flow Analyses conducted by Allen, the Company's financial advisor, yielded a value for the Company as high as $44.50 per share. Accordingly, DSM is picking up Martek at the most opportune time, at a time when Martek is poised for growth and its stock price is trading at a huge discount to its intrinsic value.

38.   Moreover, the Proposed Transaction consideration fails to adequately compensate Martek's shareholders for the significant synergies and benefits that will be realized by DSM in the merger. The Proposed Transaction is an attractive strategic acquisition for DSM. In fact, the Proposed Transaction is immediately EPS accretive for DSM by 15 to 20 euro cents per ordinary share on a full year basis. As stated in the press release announcing the Proposed Transaction:

> The purchase by DSM of Martek, a U.S. based producer of high value products from microbial sources that promote health and wellness through nutrition, will be the first major acquisition by DSM after its successful transformation into a Life Sciences and Materials Sciences company. This transaction is fully in line with DSM's strategy for its Nutrition cluster "continued value growth" and adds a new growth platform for healthy and natural food ingredients for infant formula and other food and beverage applications, especially focused on Polyunsaturated Fatty Acids (PUFAs) such as microbial Omega-3 DHA (docosahexaenoic acid) and Omega-6 ARA (arachidonic acid).

> There is significant, broad based scientific evidence about the link between health and nutrition. PUFAs have been clinically proven to have a positive impact on human health and Martek is a leader in this field. Martek therefore represents an attractive strategic acquisition for DSM. It will provide DSM with new opportunities in the infant nutrition segment as well as food and beverage and dietary supplements and create a strong platform for DSM to enter the fast growing Omega-3 and Omega-6 market through Martek's microbial DHA and ARA products.

DSM will be able to leverage DSM's global nutritional infrastructure (global market reach, application skills, R&D and manufacturing technology base) to channel and accelerate the growth of these products into other regions, applications and market segments beyond Martek's current strong US-based position in infant formula ingredients and growing position in food and beverage and dietary supplement applications. As a result of the scale and resources that DSM can bring to the already solid businesses of Martek, DSM instantly becomes a leading player in the field of microbial PUFAs and through this attractive growth segment expects to drive compelling financial performance for its shareholders. The acquisition is immediately EPS accretive for DSM by 15 to 20 euro cents per ordinary share on a full year basis.

The two companies already have a longstanding relationship as DSM supplies Martek with the key base material for its ARA product. DSM has complementary intellectual property to the broad range of patents and intellectual property Martek owns, which will further extend the competitiveness of the combined company's proprietary products.

DSM will also benefit from Martek's recent acquisition of Amerifit, an attractive consumer business for branded dietary supplements with very specific health benefits, which it will be able to use as an additional marketing channel for both Martek as well as DSM ingredients.

Furthermore, Martek's algal and other microbial-based biotechnology platform and its robust algal technology pipeline which complements DSM's own biotechnology portfolio, is expected to deliver new nutritional and non-nutritional (industrial) growth opportunities.

The acquisition is expected to realize material revenue synergies through expanded distribution, marketing and product development as well as other operational efficiencies, and will accelerate DSM's revenue growth.

39.     Despite the significant synergies inherent in the transaction for DSM, however, the Board

failed to secure a fair price for the Company, either for the intrinsic value of its assets or the value of the

Company's assets to DSM.

40.     In their role as directors of a corporation, the Individual Defendants have fiduciary

obligations to: (a) undertake an appropriate evaluation of Martek's net worth as a merger/acquisition

candidate; (b) act independently to protect the interests of the Company's public shareholders; (c)

adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests

and their fiduciary obligations, and, if such conflicts exist, to ensure that all conflicts are resolved in the best interests of Martek's public shareholders; and (d) actively evaluate the Proposed Transaction and engage in a meaningful auction with third parties in an attempt to obtain the best value on any sale of Martek.

41.     The failure of the Individual Defendants to secure an adequate price and their betrayal of the interests of the Company's public shareholders is apparent from the $31.50 per share consideration to which the Individual Defendants agreed. This proposed consideration is inadequate and unfair to Plaintiff because, in reality, it offers a small premium, does not reflect the Company's potential growth value, and thereby deprives Plaintiff of the true and full value of her shares.

42.     The consideration to be paid to Plaintiff in the Proposed Transaction is also unfair and grossly inadequate because, among other things, the intrinsic value of Martek is materially in excess of the amount offered in the Proposed Transaction.

43.     The Proposed Transaction will deny plaintiff her right to share proportionately and equitably in the true value of Martek's valuable and profitable business, and future growth in profits and earnings, at a time when the Company is poised to increase its profitability.

**D.     The Unfair Sales Process and Preclusive Deal Protections**

44.     As described in more detail below, the Individual Defendants conducted a flawed process in selling Martek, failing to adequately seek out potential buyers for the Company. The Company failed to conduct any formal pre-market check to seek out potential acquirers. Rather, after three private equity firms, as well as DSM, indicated an interest in exploring some sort of transaction or investment with Martek, the Company engaged in discussions solely with those parties, and determined not to contact any additional parties. Moreover, after both DSM and Party B submitted offers to acquire the Company

for $31.50 per share, the Board unreasonably determined to enter into a transaction with DSM despite the fact that Party B's proposal had more favorable terms for Martek than DSM's proposal, including permitting Martek to conduct a go-shop process following execution of the Merger Agreement.

45.     Between June and September of 2010, a number of private equity firms expressed interest in exploring some sort of transaction of investment with the Company, including Parties B, C, and Parties D and E (who were working together). In addition, during this time, the Company was engaged in discussions with DSM regarding potential strategic business opportunities.

46.     On September 16, 2010, the Board determined to engage Allen to review the Company's strategic alternatives. As stated in the Recommendation Statement, at this meeting, the Board "had not determined to pursue a sale of the Company."

47.     On October 12, 2010, the Board formed a Strategic Review Committee (the "Committee") consisting of directors Flanagan, Beery, D'Andrea, and MacMaster to facilitate the Company's review of strategic alternatives. At this meeting, the Board instructed Allen to contact the parties that had expressed interest in a transaction with the Company (DSM, Party B, Party C, and Party D/Party E), but not to engage in a broader solicitation process at that time.

48.     On October 13, 2010, Allen discussed with each party their "interest in pursuing a possible acquisition of the Company." The Recommendation Statement fails to adequately explain the reasons the Company shifted its strategy so quickly to pursue a sale of the Company, considering on September 16, 2010, the Board had "not determined to pursue a sale of the Company."

49.     On November 8, 2010, the Committee again determined not to seek interest from other parties. On November 18, 2010, Party C and Party D/E declined to submit proposals to acquire the Company. That same day, the Committee "discussed the potential merits and risks of contacting other

parties but determined not to do so and decided instead to seek, if a transaction were ultimately entered into, sufficient flexibility in any definitive transaction agreement to consider alternative proposals."

50.     On December 8, 2010, DSM submitted a written proposal to acquire the Company for $31.50 per share in cash. A representative of DSM stated that its offered assumed that there would be no "go shop" process. On the same day, Party B also submitted a proposal to acquire the Company for $31.50 per share.

51.     On December 9, 2010, the Committee met and determined to recommend that the Board pursue a transaction with DSM because "DSM's proposal was considered superior to Party B's proposal as it offered greater certainty of being completed than Party B's proposal."

52.     On December 10, 2010, the Board met and instructed management to proceed with negotiations with DSM, and to "send a draft form of merger agreement to Party B to solicit its response to suggested terms to keep it as a viable alternative should an agreement with DSM not be reached." Rather than negotiate with Party B to obtain a higher price, the Board was unreasonably favoring DSM and negotiating solely with DSM, while keeping Party B as a "viable alternative."

53.     On December 15, 2010, Party B submitted a response to the draft merger agreement that it had been provided. As stated in the Recommendation Statement, Party B's response "included acceptance of a go-shop period and other contract terms favorable to Martek." DSM, on the other hand, had refused to agree to a go-shop period. Despite these favorable terms, the Board determined to enter into a transaction with DSM.

54.     On December 16, 2010, the Board met and discussed the terms proposed by DSM, as well as the proposal from Party B, and the terms of the draft merger agreements from each party. The Board determined to move forward with finalizing a transaction with DSM at $31.50 per share. There is

no indication in the Recommendation Statement as to whether the Committee compared the non-financial terms of the two proposals, including the terms related to no-shop vs. go-shop, matching rights, and the termination fees of the various offers. The Merger Agreement between the Company and DSM was executed on December 20, 2010.

55.     As part of the Merger Agreement, the Board agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a fait accompli and ensure that no competing offers will emerge for the Company.

56.     For example, Section 6.8(a) of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from attempting to procure a price in excess of the amount offered by DSM. This section also demands that the Company terminate any and all prior or on-going discussions with other potential suitors. Despite the fact that they have locked up the Company and bound it to not solicit alternative bids, the Merger Agreement provides other ways that guarantee the only suitor will be DSM.

57.     Pursuant to Section 6.8 of the Merger Agreement, should an unsolicited bidder arrive on the scene, the Company must notify DSM of the bidder's offer. Thereafter, should the Board determine that the unsolicited offer is superior, DSM is granted three business days to amend the terms of the Merger Agreement to make a counter-offer that only needs to be at least as favorable to the Company's shareholders as the unsolicited offer. DSM is able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating any leverage that the Company has in receiving the unsolicited offer.

58.     In other words, the Merger Agreement gives DSM access to any rival bidder's information and allows DSM a free right to top any superior offer. Accordingly, no rival bidder is likely

to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor DSM and piggy-back upon the due diligence of the foreclosed second bidder.

59.     In addition, the Merger Agreement provides that a termination fee of $38 million must be paid to DSM by Martek if the Company decides to pursue said other offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

60.     Finally, DSM is also the beneficiary of a "Top-Up" provision that ensures that DSM gains the shares necessary to effectuate a short-form merger. Pursuant to the Merger Agreement, if DSM receives 90% of the shares outstanding through its tender offer, it can effect a short-form merger. In the event DSM fails to acquire the 90% required, the Merger Agreement also contains a "Top-Up" provision that grants DSM an option to purchase additional shares from the Company in order to reach the 90% threshold required to effectuate a short-form merger. The "Top-Up" provision essentially renders the tender offer a fait accompli and eliminates the possibility that any alternate bidder can mount a serious challenge to DSM's first-in position.

61.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions, coupled with the "Top-Up" provision, also foreclose any likely alternate bidder from providing the needed market check of DSM's inadequate offer price.

**E.** **The Individual Defendants Stand to Receive Unique, Material Financial Benefits in the Proposed Transaction, Which Are Not Available to Martek's Public Shareholders**

62.     Martek's directors have material conflicts of interest and are acting to better their own personal interests through the Proposed Transaction at the expense of Martek's public shareholders.

63.     For example, the Company's directors hold restricted stock units of the Company that, pursuant to the Merger Agreement, will no longer be subject to restrictions and will be converted into a right to receive the Proposed Transaction consideration of $31.50 per share. Specifically, defendant Dubin will receive $1,645,781 by cashing out his previously restricted stock units, and defendants Beery, D'Andrea, Devine, Flanagan, Kawalek, Keller, MacMaster, Mayer, Pernock, and Rotberg will each receive $79,790 by cashing out their restricted stock units.

64.     In addition, defendant Dubin has an employment agreement with Martek that provides for severance and other benefits in case he is terminated without "cause" or for "good reason" within one year following consummation of the Proposed Transaction. In the event of such a termination, Dubin will be entitled to receive severance and other payments totaling $1,920,388.

65.     Based on the above, the Proposed Transaction is unfair to Martek's public shareholders, and represents an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of plaintiff.

**F.** **The Materially Misleading Recommendation Statement**

66.     In order to secure shareholder approval for the Proposed Transaction, Martek issued the Recommendation Statement on January 13, 2011. The Recommendation Statement, which recommends that Martek shareholders tender their shares and vote in favor of the Proposed Transaction, omits and/or misrepresents material information about the unfair sales process, the unfair consideration, and the true intrinsic value of the Company. Specifically, the Recommendation Statement omits and/or misrepresents

the material information set forth below in contravention of Sections 14(e) and 20(a) of the 1934 Act and/or defendants' duty of candor and full disclosure under state law.

67.     With respect to the Company's forecasts and projections, the Recommendation Statement fails to disclose the Company's free cash flow projections for years 2011 through 2020, as well all line items necessary to calculate the Company's free cash flows for years 2011 through 2020, including net income, depreciation and amortization, changes in working capital, and capital expenditures.

68.     In addition, the Recommendation Statement completely fails to disclose the underlying methodologies, key inputs, and multiples relied upon and observed by Allen, Martek's financial advisor, so that shareholders can properly assess the credibility of the various analyses performed by Allen and relied upon by the Board in recommending the Proposed Transaction. For example, with respect to the "Sum-of-the-Parts Discounted Cash Flow Analyses," the Recommendation Statement fails to disclose: (a) the calculations made by Allen to calculate the Company's free cash flows; (b) the free cash flow amounts calculated for years 2011 through 2020 for each of the three business unit analyses; (c) the criteria used to select the terminal value multiples and perpetuity growth rates that were used for each of the three business unit analyses; (d) the criteria and key inputs used to calculate the discount rates used for each of the three business unit analyses; (e) the implied per share equity reference range calculated for each of the three business unit analyses; and (f) the calculations made and equity reference range calculated for the Company's long-term research and development projects.

69.     With respect to the Sum-of-the-Parts Selected Companies Analyses, the Recommendation Statement fails to disclose: (a) the criteria used to select the companies used in the analysis; (b) the reasons the Infant Formula Products, Non-Infant Formula Nutritional Products, and "Other" Businesses were grouped together in the analysis; (c) the multiples observed for each company

in the analysis; (d) the reference ranges that were applied to the Company's corresponding financial data for the Infant Formula Products, "Other" Businesses and Non-Infant Formula Nutritional Products analysis, the criteria used to select the reference range, and the implied per share equity reference range calculated in the analysis; (e) the reference ranges that were applied to the Company's corresponding financial data for the Amerifit and Branded Products analysis, the criteria used to select the reference range, and the implied per share equity reference range calculated in the analysis; and (f) the implied equity value reference range calculated for the Company's long-term research and development projects, as well as how such range was calculated, including the precedent venture capital investments for emerging technology companies that were considered, and the multiples or other metrics observed for such companies.

70.     The Recommendation Statement states that Allen conducted a "selected precedent transactions involving target companies in the food ingredient and nutritional products industries," but fails to disclose the transactions used, multiples and metrics observed, and the results of the analysis.

71.     The Recommendation Statement states that Allen conducted a "premiums paid in selected precedent transactions involving target companies with pre-transaction market capitalizations of between $750 million and $1.0 billion announced between January 1, 2007 and December 17, 2010," but fails to disclose the transactions used, premiums observed, and results of the analysis.

72.     The Recommendation Statement fails to disclose how much of Allen's $9.8 million fee is contingent on the Proposed Transaction closing. In addition, the Recommendation Statement fails to disclose whether Allen has performed any services for Martek or DSM in the past two years, and if so, to disclose the nature of the services and the amount of compensation received or to be received by Allen for such services. It is material for shareholders to be informed of the financial and economic

interests Allen has in the Proposed Transaction or in the parties involved that could be perceived or create a conflict of interest.

73.    The Recommendation also fails to disclose material information concerning the reasons the Individual Defendants determined to enter into a transaction with DSM considering Party B also submitted a $31.50 offer to acquire the Company, and considering Party B had agreed to permit the Company to conduct a go-shop process, while DSM refused. The Recommendation Statement:

(a)    fails to disclose the reasons why the Committee determined on December 9, 2010 that DSM's proposal "offered greater certainty of being completed than Party B's proposal";

(b)    fails to disclose whether the Company engaged in any discussions with Party B following December 8, 2010 in an attempt to get Party B to raise its $31.50 offer;

(c)    states that on December 16, 2010, the Board "considered both DSM's and Party B's offers and determined to move forward with finalizing a transaction with DSM at $31.50 per share" but fails to disclose the factors of each proposal that were considered by the Board, and the reasons the Board determined to move forward with DSM as opposed to Party B;

(d)    fails to disclose the "other contract terms favorable to Martek" that were in the draft merger agreement submitted by Party B on December 15, 2010, as well as what were the terms relating to the length of the go-shop period, the termination fee, and matching rights; and

(e)    fails to disclose the reasons the Company chose to enter into a transaction without a go-shop process, especially considering the Committee determined on November 21, 2010 that if it ultimately entered into a transaction, it would do so with "sufficient flexibility" to consider alternative proposals.

74.     The Recommendation Statement also fails to disclose material information concerning the process conducted by Martek in seeking an acquirer for the Company. In particular, the Recommendation Statement:

(a)     fails to disclose the "interest recently expressed by Party B" that was discussed by the Board in June 2010;

(b)     fails to disclose the reasons defendant Dubin "declined to discuss a 'going private' transaction with Party D" in August 2010;

(c)     fails to disclose the reasons the Board "had not determined to pursue a sale of the Company" on September 16, 2010;

(d)     states that on September 16, 2010, the Board was "considering other indications of interest that had been received" but fails to disclose the terms/value of the indications of interest that were being considered and the parties that submitted such indications of interest;

(e)     fails to disclose the criteria used to select defendants Flanagan, Beery, D'Andrea, and MacMaster to serve on the Committee;

(f)     fails to disclose the reasons the Board determined "not to engage in a broader solicitation process" on October 12, 2010;

(g)     states that on October 13, 2010, Allen discussed with "each party its interest in pursuing a possible acquisition of the Company" but fails to disclose when the Company determined to pursue a sale of the Company, considering the Recommendation Statement states that on September 16, 2010, the Board "had not determined to pursue a sale of the Company";

(h)     fails to disclose the reasons "no further discussions were held" with the two private equity firms that expressed an interest in the Company late October/early November 2010;

(i)     fails to disclose the reasons the Committee determined not to seek interest from other parties on November 8, 2010;

(j)     fails to disclose the reasons Party D/Party E declined to submit a proposal in November 2010;

(k)     the "potential merits and risks of contacting other parties" that were discussed by the Committee on November 21, 2010, and the reasons the Committee determined not to contact other parties; and

(l)     fails to disclose the specific factors and reasons the Board considered on December 10, 2010 in concluding that "it was highly unlikely that a higher purchase price would be obtained from a financial or other strategic buyer."

75.     Accordingly, plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that she will continue to suffer absent judicial intervention.

### CAUSES OF ACTION

### COUNT I

**Breach of Fiduciary Duties**
**(Against the Individual Defendants)**

76.     Plaintiff repeats and realleges each and every allegation set forth herein.

77.     The Individual Defendants have violated the fiduciary duties owed to the public shareholders of Martek and have acted to put their personal interests ahead of the interests of Martek shareholders or acquiesced in those actions by fellow Defendants. These Defendants have failed to take

26

adequate measures to ensure that the interests of Martek's shareholders are properly protected and provides DSM with an unfair advantage by effectively excluding other alternative proposals.

78.     By the acts, transactions, and courses of conduct alleged herein, these Defendants, individually and acting as a part of a common plan, will unfairly deprive Plaintiff of the true value of her Martek investment. Plaintiff will suffer irreparable harm unless the actions of these Defendants are enjoined and a fair process is substituted.

79.     The Individual Defendants have breached their duties of loyalty, entire fairness, good faith, and care by not taking adequate measures to ensure that the interests of Martek's public shareholders are properly protected from over-reaching by DSM.

80.     By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff.

81.     As a result of the actions of Defendants, Plaintiff has been, and will be, irreparably harmed in that she has not, and will not, receive her fair portion of the value of Martek's stock and businesses, and will be prevented from obtaining a fair price for her common stock.

82.     Unless enjoined by this Court, the Individual Defendants will continue to breach the fiduciary duties owed to Plaintiff and may consummate the Proposed Transaction to the disadvantage of the public stockholders, without providing sufficient information to enable Martek's public shareholders to be properly informed.

83.     The Individual Defendants have engaged in self-dealing, have not acted in good faith to Plaintiff, and have breached, and are breaching, fiduciary requirements to Plaintiff.

84.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that these actions threaten to inflict.

## COUNT II

### Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duties
### (Against Martek)

85.     Plaintiff repeats and realleges each and every allegation set forth herein.

86.     The Individual Defendants breached their fiduciary duties to the Martek stockholders by the actions alleged herein.

87.     Such breaches of fiduciary duties could not, and would not, have occurred but for the conduct of Martek, which, therefore, aided and abetted such breaches through entering into the Proposed Transaction between Martek and DSM.

88.     Defendant Martek had knowledge that it was aiding and abetting the Individual Defendants' breaches of fiduciary duties to Martek stockholders.

89.     Defendant Martek rendered substantial assistance to the Individual Defendants in their breaches of their fiduciary duties to Martek stockholders.

90.     As a result of Martek's conduct of aiding and abetting the Individual Defendants' breaches of fiduciary duties, Plaintiff has been, and will be, damaged in that she has been, and will be, prevented from obtaining a fair price for her shares.

91.     As a result of the unlawful actions of defendant Martek, Plaintiff will be irreparably harmed in that she will be prevented from obtaining the fair value of her equity ownership in the Company. Unless enjoined by the Court, Defendant Martek will continue to aid and abet the Individual Defendants' breaches of their fiduciary duties owed to Plaintiff, and will aid and abet a process that

28

inhibits the maximization of stockholder value and the disclosure of material information.

92.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

### Violations of Section 14(e) of the 1934 Act and
### Rule 14a-9 Promulgated Thereunder
### (Against the Individual Defendants and Martek)

93.     Plaintiff repeats and realleges each and every allegation set forth herein.

94.     During the relevant time period, the Individual Defendants and Martek disseminated the false and misleading Recommendation Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95.     The Recommendation Statement was prepared, reviewed, and/or disseminated by the Individual Defendants and Martek. It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets.

96.     In so doing, the Individual Defendants and Martek made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions at the Company, the Individual Defendants and Martek were aware of this information and of their duty to disclose this information in the Recommendation Statement.

97.     The Individual Defendants and Martek were at least negligent in filing the Recommendation Statement with these materially false and misleading statements.

98.     The omissions and false and misleading statements in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares and how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Recommendation Statement and in other information reasonably available to shareholders.

99.     By reason of the foregoing, the Individual Defendants and Martek have violated Section 14(e) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

100.    Because of the false and misleading statements in the Recommendation Statement, plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT IV

### Violation of Section 20(a) of the 1934 Act
### (Against the Individual Defendants and Martek)

101.    Plaintiff repeats and realleges each and every allegation set forth herein.

102.    The Individual Defendants acted as controlling persons of Martek within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Martek, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends is false and misleading.

103.    Each of the Individual Defendants and Martek was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

105.    Martek also had direct supervisory control over composition of the Recommendation Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Recommendation Statement. Martek, in fact, disseminated the Recommendation Statement and is, thus, directly responsible for materially misleading shareholders because it permitted the materially misleading Recommendation Statement to be published to shareholders.

106.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants and Martek were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Recommendation Statement purports to describe the various issues and information that they reviewed and considered, descriptions that had input from both the directors and Martek.

107.    By virtue of the foregoing, the Individual Defendants and Martek have violated Section 20(a) of the 1934 Act.

108.    As set forth above, the Individual Defendants and Martek had the ability to exercise control over and did control a person or persons who have each violated Section 14(e) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, Martek will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in her favor and against the Defendants as follows:

A.    Declaring that the Individual Defendants have breached their fiduciary duties to Plaintiff;

B.    Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Individual Defendants adopt and implement a fair procedure or process to sell the Company;

C.    Declaring the Proposed Transaction void and ordering rescission if consummated;

D.    Awarding damages, including rescissory damages, in favor of Plaintiff against all Defendants, jointly and severally, together with interest thereon;

E.    Awarding Plaintiff the costs, expenses, and disbursements of this action, including any attorneys' and experts' fees and if applicable, pre-judgment and post-judgment interest; and

F.    Awarding Plaintiff such other relief as this Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated this 4th day of February, 2011

**BROWER PIVEN**
 **A PROFESSIONAL CORPORATION**


*/s/ Charles J. Piven*
Charles J. Piven (00967)
piven@browerpiven.com
Yelena Trepetin (28706)
trepetin@browerpiven.com
1925 Old Valley Road
Stevenson, Maryland 21153
T: (410) 332-0030
F: (410) 685-1300

David A.P. Brower
brower@browerpiven.com
Brian C. Kerr
kerr@browerpiven.com
488 Madison Avenue
Eighth Floor
New York, New York 10022
T: (212) 501-9000
F: (212) 501-0300

*Attorneys for Plaintiff*